UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FREEPOINT COMMODITIES LLC and FREEPOINT COMMODITIES SINGAPORE PTE LTD., <br><br> Plaintiffs, <br><br> v. <br><br> RIDGEBURY KILO LLC and SEAWOLF TANKERS INC., <br><br> Defendants. | No. 20-CV-07246 (RA) <br><br> OPINION & ORDER |

RONNIE ABRAMS, United States District Judge:

Plaintiffs Freepoint Commodities LLC and Freepoint Commodities Singapore Pte Ltd. ("Plaintiffs" or the "Freepoint Entities") bring this action in admiralty against Defendants Ridgebury Kilo LLC and Seawolf Tankers Inc. The underlying dispute, which concerns the chartering of a maritime vessel carrying fuel oil from the Caribbean to Southeast Asia, is also the subject of a related action pending before this Court. Defendant Seawolf Tankers Inc. now moves for judgment on the pleadings to dismiss three of the causes of action against it—the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

### I. Factual Background

The Court draws the following facts from the Fourth Amended Complaint (the "Complaint") in this action, Dkt. 79, and accepts the factual allegations as true, drawing all reasonable inferences in Plaintiffs' favor. *See, e.g.*, *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir.

2009).

The dispute in this action concerns a vessel that was chartered to transport fuel oil (the "Cargo") from the Caribbean to Asia. *Id.* ¶¶ 23, 29. The vessel, the M/T RIDGEBURY PROGRESS (the "Vessel"), was at all relevant times owned by Defendant Ridgebury Kilo and let to Defendant Seawolf Tankers Inc. ("Seawolf") pursuant to an agreement known as a Time Charter Party ("Time Charter"). *Id.* ¶ 7. Under the Time Charter, Ridgebury Kilo warranted that the Vessel would be "in every way fit to carry crude petroleum and/or its products," and would be "tight, staunch, strong, in good order and condition and in every way fit for the service" throughout the duration of the Time Charter. *Id.* ¶ 8. Defendant Seawolf, as the Vessel's "time charterer and disponent owner," in turn sublet the Vessel to Laurel Shipping LLC ("Laurel") "for a single trip/carriage of fuel oil from the Caribbean to Singapore" pursuant to the terms of a "voyage charter party" dated November 20, 2019 (the "Voyage Charter").[1] *Id.* ¶ 9.

Under the Voyage Charter, Seawolf was obligated to "make and maintain the Vessel, her tanks, pumps, valves and pipelines tight, staunch, strong, in good order and condition, in every way fit for the voyage and fit to carry the cargo," among other guarantees of seaworthiness. *Id.* ¶ 10. Various clauses of the Voyage Charter indicated that the conveyance of the Vessel's cargo (the "Cargo") involved additional parties that "would act as the shipper and consignee" i.e., "the owners of the Cargo." *Id.* ¶ 12. The Voyage Charter included repeated references to the "bills of lading" holders, which were issued upon the completion of the loading of the Vessel and designated Plaintiff Freepoint Commodities as the "shipper" of the Cargo and Plaintiff Freepoint Singapore as the "consignee" of the Cargo. *Id.* ¶¶ 3, 4, 12. Laurel, a party to the Voyage Charter, "was known

---

[1] Laurel Shipping LLC was originally a plaintiff in this action, but the Court dismissed its claims with prejudice on September 17, 2021, finding that its claim for breach of contract was duplicative of its counterclaim in the related action before this Court, 20-cv-5198. Dkt. 72.

2

in the trade as the trading arm of the Freepoint family of companies that acted in the capacity as a voyage charterer for the carriage of oil products purchased and/or being sold by Plaintiffs." *Id.* ¶ 13. According to Plaintiffs, Defendant Seawolf, the other party to the Voyage Charter, and Defendant Ridgebury "were aware, from their business operations prior to the Voyage Charter, of the structure within the Freepoint family of companies," namely, that Laurel was the "trading arm" for the Freepoint Entities. *Id.* ¶ 14. Prior to the finalization of the Voyage Charter, Seawolf communicated directly with the Freepoint Entities regarding the voyage and the transfer of the Cargo, and "obtained documents and information necessary to facilitate the ship-to-ship transfers at loading and discharge of the product they owned." *Id.* ¶¶ 15, 86.

Plaintiffs allege that Seawolf knew that the Vessel was in poor condition before the execution of the Voyage Charter but failed to inform them of the Vessel's "significant and chronic issues" during the negotiations. *Id.* ¶¶ 43, 44. Between May and December 2019, the Vessel purportedly suffered from issues with its main engine and valves, as well as gyro issues, fuel leaks, fuel pump punctures and other mechanical problems. *Id.* ¶¶ 34-39. In late December 2019, the Vessel was delivered under the Voyage Charter to St. Croix for loading of part of the Cargo (fuel oil). *Id.* ¶ 23. While the Vessel was being loaded, Freepoint Singapore and Freepoint Commodities entered into a contract of sale for the Cargo at a fixed price. *Id.* ¶ 25. The Vessel completed loading at St. Croix on December 31, 2019, and then traveled to the Bahamas for loading of additional product, which was completed on January 17, 2020. *Id.* ¶¶ 47, 48. The bills of lading were issued on January 16, 2022, Dkt. 58-2, and, as described above, identified Freepoint Singapore as the consignee of the Cargo, and Freepoint Commodities as the shipper of the Cargo based on the contract of sale between the Freepoint Entities. Compl. ¶ 26. The Vessel then departed for Singapore via the Cape of Good Hope. *Id.* ¶ 48.

According to Plaintiffs, the voyage to Singapore was "plagued" with "breakdowns, malfunctions, stoppages and an incessant need for repairs." *Id.* ¶ 57. Numerous parts of the Vessel needed repair or replacing, including broken piston rings, cylinders, exhaust valves, pumps and fuel injector valves, as well as the turbocharger, liners and piston crowns. *Id.* ¶ 60. The repairs required repeated stops and deviations, including to St. Helena, Cape Town, Port Louis in Mauritius, causing a delay of "some 55 days," with the Vessel ultimately arriving in Malaysia on April 24. *Id.* ¶¶ 60, 61. Along the voyage, Defendants allegedly engaged in "a pattern of deceit and subterfuge" that was "designed to mask the severity of the conditions on board the Vessel," understating, concealing, or delaying reports of breakdowns and deviations. *Id.* ¶¶ 62, 63, 66–69. Seawolf purportedly failed to report, for example, a January 26 stoppage to Laurel and the Freepoint Entities, and did not report a January 28 stoppage until January 30. *Id.* ¶¶ 64, 66.

As a result of the delay, Plaintiffs were unable to market the Cargo for sale in a timely manner, and consequently suffered a "loss of value of the Cargo," additional borrowing costs, and other damages in excess of $29 million. *Id.* ¶ 76.

## II.    Procedural Background

Litigation between the parties and related entities began on July 7, 2020, when Seawolf filed suit against Laurel seeking payment for alleged unpaid freight and port costs due under the Voyage Charter. *See* No. 20-cv-5198, Dkt. 1. On October 20, 2021, Seawolf filed a motion for partial summary judgment in that action, which the Court denied on September 27, 2022.

Plaintiffs and Laurel initiated this action against Ridgebury Kilo LLC on September 4, 2020, seeking a maritime attachment and garnishment under Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims. Dkt. 1. Plaintiffs and Laurel filed an Amended Complaint on September 15, asserting substantially the same claims, Dkt. 19, and eventually filed the Second

Amended Complaint on October 23, 2020, which asserted contract and tort claims, and added Defendant Seawolf. Dkt. 40. On the same day, the Court consolidated the two actions under the docket number of the lead case, 20-cv-5198. Dkt. 44. On September 17, 2021, the Court granted Seawolf's motion to dismiss Plaintiffs' Second Amended Complaint but gave Freepoint Singapore leave to amend, *Laurel Shipping LLC v. Ridgebury Kilo LLC*, 560 F. Supp. 3d 802 (S.D.N.Y. 2021), and on October 8, 2021, it permitted Plaintiffs to "reinstate" Freepoint Commodities as a plaintiff on any future amended complaint. Dkt. 78.

On October 15, 2021, Freepoint Commodities and Freepoint Singapore filed the Fourth Amended Complaint, asserting claims for breach of contract and the implied covenant of good faith and fair dealing against both Ridgebury and Seawolf, and four additional claims against Seawolf—for negligence, conversion, tortious interference and misrepresentation. Seawolf answered the Fourth Amended Complaint on November 12, 2021, and subsequently filed the instant motion for judgment on the pleadings to dismiss the breach of contract, breach of implied covenant of good faith and fair dealing and conversion claims. The Court now grants that motion as to the claim for conversion, but denies it as to the claims for breach of contract and breach of implied covenant of good faith and fair dealing.

## LEGAL STANDARD

A motion for judgment on the pleadings pursuant to Rule 12(c) is governed by "the same standard applicable to dismissals pursuant to [Rule] 12(b)(6)," in which courts "accept all factual allegations in the complaint as true and draw all reasonable inference in [the non-moving party's] favor." *Johnson*, 569 F.3d at 43.[2] To survive a Rule 12(c) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, omissions, and alterations.

5

face.'" *Id.* at 44 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 (2009)).[3] The Court may also consider "the complaint, the answer, any written documents attached to them," and "any materials incorporated in [the Complaint] by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

## DISCUSSION

### I. Breach of Contract Claim

Seawolf argues that dismissal of Plaintiffs' breach of contract claim is justified because Plaintiffs fail to properly allege that they were third-party beneficiaries to the Voyage Charter such that they could be entitled to relief for breach of the Charter. According to Seawolf, Plaintiffs "cannot as a matter of law establish that the Voyage Charter, or any of the clauses therein, was intended for their benefit," Mot. at 14, and Plaintiffs fail to allege facts regarding the negotiation of the Voyage Charter that establish that it was intended to benefit them. The Court disagrees.

As the Court explained when evaluating the Second Amended Complaint, in this admiralty action, "the general maritime law, as developed by the judiciary, applies." *E. River S.S. Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 864 (1986). "Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *Id.* at 864–65. Under this framework, "[c]harter parties and bills of lading are interpreted using the ordinary principles of maritime contract law," *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 823 (2d Cir. 2006), to which common law third-party beneficiary

---

[3] Seawolf misstates the standard of review for judgment on the pleadings, citing *Grevo v. Trauner, Cohen & Thomas, LLP*, 412 F.3d 360, 363 (2d Cir. 2005), for the since-overruled proposition that "a complaint may not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Mot. at 6. The Court will instead apply the well-established plausibility standard articulated in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 (2009) (plaintiff must plead "more than a sheer possibility that a defendant has acted unlawfully" and expanding the plausibility standard to cover pleadings in "all civil actions").

principles are generally applicable, *In re M/V Rickmers Genoa Litig.*, 622 F. Supp. 2d 56, 72 (S.D.N.Y. 2012), *aff'd sub nom. Chem One, Ltd. v. M/V RICKMERS GENOA*, 502 F. App'x 66 (2d Cir. 2012).

To succeed on a claim for breach of contract as a third-party beneficiary, a third party "must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006). An intent by the parties to permit enforcement by the third party must be clear from the face of the contract, such that the benefit to the third party was "sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [the third party] if the benefit [was] lost." *Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012). In addition to considering the contract itself, courts may look to the surrounding circumstances to determine whether "the promisee intend[ed] to give the third party the benefit of the promised performance." *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991). Moreover, "dismissal of a third-party-beneficiary claim is appropriate where the contract rules out any intent to benefit the claimant." *Subaru Distributors v. Subaru of America*, 425 F.3d 119, 124 (2d Cir. 2005).

When granting Seawolf's motion to dismiss the Second Amended Complaint, the Court held that Plaintiffs did not state a claim for breach of contract because they failed to allege that Freeport Singapore was a third-party beneficiary to the Voyage Charter between Laurel and Seawolf. In so doing, it noted that the Second Amended Complaint contained "next to no factual allegations about any of the agreements that Seawolf executed," finding that "Plaintiffs further[ed]

7

no argument that any intent to benefit Freepoint Singapore can be gleaned from the face of the Charter, nor can the Court discern such an intent from the mere fact that the Charter mentions 'bills of lading.'" *Laurel Shipping*, 560 F. Supp. 3d at 808.

Plaintiffs' Fourth Amended Complaint corrects those failings. As Plaintiffs allege, numerous clauses of the Voyage Charter reference Seawolf and Laurel's intent to safely and speedily deliver the Cargo to the Freepoint Entities. Compl. ¶¶ 9–12, Dkt. 58-1. For example, the Voyage Charter includes a warranty that Seawolf "make and maintain the Vessel, her tanks, pumps, valves and pipelines tight, staunch, strong, in good order and condition, in every way fit for the voyage and fit to carry the cargo." Dkt. 58-1 at 16. The Voyage Charter also requires that the owners of the Vessel, i.e., Seawolf and its non-party affiliate Heidmar, "proceed… to the discharge port … in accordance with Charters' Voyage Orders, or so near thereto as she may safely reach, and deliver the cargo in consideration of the payment of freight [...]" and that Seawolf must "undertake that the Vessel is able to load, carry and discharge" the Cargo. *Id.* at 17. These warranties necessarily benefit the Freepoint Entities as the owners of the Cargo by providing for the Cargo's secure and efficient delivery.

The benefit to Plaintiffs, moreover, was "immediate rather than incidental." *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 275 (S.D.N.Y. 2009), *aff'd sub nom. Silverman v. Teamsters Loc. 210 Affiliated Health & Ins. Fund*, 761 F.3d 277 (2d Cir. 2014) (third party was an intended beneficiary where the relevant contract identified it as recipient of payments). As Plaintiffs allege and the bills of lading make clear, Freepoint Singapore was designated to receive delivery of the Cargo. Dkt. 58-2 at 1 ("This Cargo shall be delivered in the like good order and condition to one or more safe port/(s), Singapore/Malaysia, so near thereto as the vessel can safely get, always afloat, unto 'Order of Freepoint Commodities Singapore PTE LTD'"). Where, as here,

8

"performance is to be rendered directly to a third party under the terms of an agreement, that party must be considered an intended beneficiary." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991). Although the Voyage Charter itself does not identify Freepoint Singapore by name, "it is well-settled that the obligation to perform to the third party beneficiary need not be expressly stated in the contract." *Trans-Orient Marine Corp.*, 925 F.2d at 573. Moreover, the Voyage Charter describes at least one circumstance in which Seawolf was to render performance to Freepoint Singapore directly. In the event the original bill of lading was not available when the Vessel arrived at its discharge port, the Voyage Charter required Seawolf to discharge the Cargo "upon presentation by the consignee nominated by Charterers of reasonable identification." Dkt. 58-1 at 30. *See also* Restatement (Second) of Contracts § 302(b) (1981) (an intended third-party beneficiary will be found when it is appropriate to recognize a right to performance in the third party).

The Voyage Charter also "clearly evidence[s] an intent to permit enforcement" of the Charter by the Freepoint Entities. *Consol. Edison, Inc. v. Northeast Utils.*, 426 F.3d 524, 528 (2d Cir. 2005); *see also Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1234 (S.D.N.Y. 1994), *aff'd*, 43 F.3d 1458 (2d Cir. 1994). One provision of the Voyage Charter provides that Seawolf, as the Vessel's disponent owner, could be liable to the Freepoint Entities in the event of breach:

> The owner shall not be responsible vis a vis shipper or consignee for any damage to cargo or loss associated with the blening [sic] operation, unless caused by owners, masters or crew negligence or failure to comply with proper voyage orders.

Dkt. 58-1 at 6. Seawolf argues that this provision "expresses the Charterers' agreement that Owners are not responsible for any claims the shipper or consignee may assert … with respect to cargo damaged during blending." Mot. at 10. But Seawolf ignores the sentence's second clause,

9

which indicates that Seawolf may be liable to Plaintiffs for cargo damage if the damage is caused by Seawolf's own negligence. *See Bayerische Landesbank*, 692 F.3d at 54 (finding that third party was an intended beneficiary where the relevant contract "delineat[ed] the scope of [defendant's] liability" to the third party); *Barnum*, 850 F. Supp. at 1234 (third party's "right to enforce the contract" supported a claim that third party was intended beneficiary).

Other sections of the Voyage Charter, too, describe circumstances in which Seawolf could be liable in the case of breach of the Voyage Charter. The Voyage Charter provides:

> If the Vessel fails to maintain Charter Speed … Owners shall, subject to Clause 38, be liable for all loss, damage, cost and expense arising as a direct consequence thereof save to the extent that Owners can prove that such failure was attributable either to adverse weather conditions and sea state or to the requirements for the safe navigation of the Vessel. Charterers shall be entitled to ~~deduct~~ claim from owner any such loss, damage, cost and expense ~~from any demurrage due to Owners hereunder~~ without prejudice to any other rights available to Charterers under this Charter or otherwise under English law.

Dkt. 58-1 at 18.[4] Although this provision specifically describes the "Charterers" (Laurel's) entitlement to claim from Seawolf any such loss, it includes no disclaimer from liability as to the "Owners," i.e., Seawolf, nor does it indemnify Seawolf against claims by Plaintiffs.

By contrast, at least two other clauses of the Voyage Charter specifically indemnify Seawolf against claims brought by the Freepoint Entities. One provides that "Charterers [are] to indemnify Owners for all claims brought by holders of Bills of Lading [i.e, Plaintiffs] by reason of delays whilst vessel at anchorage as per Charterers instructions," Dkt. 58-1 at 30, while a second provides that "Charterers hereby indemnify Owners … against claims brought by holders of Bills of Lading against Owners by reason of any deviation required by Charterers under Clauses 22, 23 or 28," which specifically pertain to delays resulting from orders by Charterers (Laurel). Dkt. 58-1 at 33. Both provisions suggest that the parties anticipated enforcement by the Bills of Lading

---

[4] The strikethroughs are contained in the original.

holders, i.e., the Freepoint Entities, against Seawolf. In addition, the indemnification clauses in these clauses indicate that Seawolf and Laurel did not intend to indemnify against the Freepoint Entities in all instances where Seawolf breached the Charter, including, for example, Seawolf's breach of warranty of the Vessel's seaworthiness to convey the Freepoint Entities' Cargo. *See Matter of Trs. Established under the Pooling & Servicing Agreements relating to the Wachovia Bank Com. Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series 2007-C30*, 375 F. Supp. 3d 441, 453 (S.D.N.Y. 2019) ("[T]he presence of a phrase applicable to one factor makes clear that the phrase's omission elsewhere was deliberate."); *Novella v. Westchester Cnty.*, 661 F.3d 128, 142 (2d Cir. 2011) ("[T]he presence of that provision applicable to one type of pension makes clear that the omission of that provision in the part of the Plan governing another type of plan was deliberate."). It would be unnecessary to include clauses indemnifying Seawolf against claims by the Freepoint Entities in these instances if those entities were not entitled to enforce the Voyage Charter at all. *See Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) ("We disfavor contract interpretations that render provisions of a contract superfluous."). These express provisions, particularly when viewed in light of the purpose of the Voyage Charter, strongly suggest that the parties intended to give the Freepoint Entities the right to enforce the guaranties of seaworthiness and speedy delivery of the Cargo. *See Chen v. St. Beat Sportswear, Inc.*, 226 F. Supp. 2d 355, 365 (E.D.N.Y. 2002) (finding that contract's silence on whether third-party beneficiaries could bring suits to enforce contract was "not fatal to the plaintiffs' claim because … an intent to benefit the plaintiffs may otherwise be gleaned from the contract as a whole"); *cf. India.Com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005) (inclusion of clause explicitly disclaiming any liability to third parties barred third-party claim).

In support of its motion, Seawolf argues that the "Freepoint Plaintiffs are not specifically

11

mentioned in the Voyage Charter, and no intention to benefit the Freepoint Plaintiffs can be gleaned from the face of the Voyage Charter." Mot. at 12. Although it is true that the Voyage Charter does not identify the Freepoint Entities by name, "a beneficiary need not be identified prior to seeking enforcement of its rights under a contract." *Spear, Leeds & Kellogg v. Cent. Life Assur. Co.*, 85 F.3d 21, 27 (2d Cir. 1996), (citing Restatement (Second) of Contracts § 308 cmt. a (1981)). The Voyage Charter includes numerous references to the "Bill of Lading holders" as well as the "shipper" and "consignee," i.e., the Freepoint Entities whose identities Seawolf is alleged to have known when the Voyage Charter was finalized.

To the extent that the Voyage Charter is ambiguous as to the parties' intentions or the identities of the "shipper" and "consignee" described in the Charter, the Court may consider "extrinsic evidence as to the parties' intent," including Plaintiffs' allegations about the interactions between the parties. *Bayerische* 692 F.3d at 56 (circuit court noting it would consider plaintiff's allegations about its conversations and interactions with defendants on review of district court's dismissal of third-party beneficiary's claim). Plaintiffs allege that Laurel, the other party to the Voyage Charter, "was known in the trade as the trading arm of the Freepoint family of companies that acted in the capacity as a voyage charterer for the carriage of oil products." Compl. ¶ 13. Moreover, Seawolf communicated with the Freepoint Entities directly about the transfer of the Cargo prior to finalizing the Voyage Charter, including by obtaining "documents and information necessary to facilitate the ship-to-ship transfers at loading and discharge" of the Cargo. *Id*. ¶¶ 15, 86. *See Bayerische Landesbank,* 692 F.3d at 54 (finding that plaintiff's allegations that it had direct contact with defendant regarding execution of contract supported claim that plaintiff was third-party beneficiary). Drawing all inferences from the allegations in the Complaint in Plaintiffs' favor, Seawolf knew that the Freepoint Entities were the "owners of the Cargo" and would be

12

receiving it. Compl. ¶ 12, 13. The Court thus finds that Plaintiffs' allegations regarding their direct contact with Seawolf during the negotiation of the Voyage Charter further support the language in the Voyage Charter evincing the parties' intent to benefit the Freepoint Entities. *Bild v. Konig*, No. 09-CV-5576 (ARR) (VVP), 2012 WL 13109964, at *16 (E.D.N.Y. Dec. 20, 2012) (finding on summary judgment that "the circumstances surrounding the transaction" supported determination that plaintiff was an intended third-party beneficiary); *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim.").

Seawolf also argues that the Voyage Charter "rules out any intent to benefit the Freepoint Plaintiffs." Mot. at 8. But Seawolf does not point to any clause in the Voyage Charter that in fact "rules out any intent to benefit the Freepoint Plaintiffs," such as an absolute disclaimer on liability. Nor does the Court identify any such clause. *Cf. Subaru Distributors v. Subaru of Am.*, 425 F.3d 119, 125 (2d Cir. 2005) (a contract's "anti-assignment clause suggests an intent to limit the obligation of the contract to the original parties"). To the contrary, the Voyage Charter's purpose was plainly to ensure the timely and secure conveyance of the Cargo and guarantee its delivery to the Freepoint Entities. "That [Laurel] would also benefit" from the Voyage Charter "does not militate against the conclusion that [Seawolf] undertook an obligation to the third party" Freepoint Entities. *Spanierman Gallery v. Merritt*, No. 00-CV-5712 (THK), 2004 WL 1781006, at *12 (S.D.N.Y. Aug. 10, 2004). In any case, it is clear that Laurel, acting in its capacity as a charterer for the Freepoint Entities' Cargo, "intend[ed] to give [the Freepoint Entities] the benefit of the promised performance." *Trans–Orient Marine Corp*, 925 F.2d at 573; *see also Drake v. Drake*, 455 N.Y.S.2d 420, 422 (N.Y. App. Div. 1982).

The reasoning set forth in *In re Frescati Shipping Co., Ltd.*, 718 F.3d 184 (3d Cir. 2013), is also instructive here. In *Frescati*, the Third Circuit considered claims brought by a vessel owner (Frescati) against a group of shipping affiliates (CARCO) that had subchartered the Frescati vessel from an intermediary to transport fuel. The agreement between the intermediary and CARCO to subcharter Frescati's vessel included a "safe berth warranty" that guaranteed the safety of Frescati's vessel. *Id.* at 189. The court held that Frescati was a third-party beneficiary and could sue for breach of the safe berth warranty even though it was not identified by name in the agreement, because the "warranty explicitly cover[ed] the safety of the vessel," and "it would be nonsensical to deprive the vessel's owners the benefits of this promise." *Id.* at 199. Similarly, here, the warranties in the Voyage Charter guarantee the safe delivery of Plaintiffs' Cargo and plainly benefit its owners. Defendant's "promise to protect" the Cargo "flows through the intermediary part[ies] to the ultimate party who bore the pain" of the untimely delivery of the Cargo, namely, the Freepoint Entities. *Id.* As in *Frescati*, "the circumstances indicate" that the Voyage Charter is thus intended to endow the Cargo, along with its owners, the Freepoint Entities, with "the benefit" of the guarantees of safe and timely delivery. *Id.* at 198.

Accordingly, based on the language of the Voyage Charter, as well as Plaintiffs' allegations regarding its interactions with Seawolf during negotiations, the Court finds that Plaintiffs have plausibly alleged that they were intended beneficiaries of the Voyage Charter. Seawolf's motion to dismiss the breach of contract claim is therefore denied.

### II.     Breach of Implied Covenant of Good Faith Claim

Having found that Plaintiffs plausibly allege they were intended third-party beneficiaries to the Voyage Charter, the Court next considers Seawolf's motion to dismiss Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. The Court begins by noting that

"[e]very maritime contract imposes an obligation of good faith and fair dealing between the parties," *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1359 (S.D. Fla. 2007) (collecting cases), *aff'd*, 308 F. App'x 389 (11th Cir. 2009). Third-party beneficiaries, like parties to a contract, are owed a duty of good faith and fair dealing. *See, e.g.*, *Donald v. Liberty Mut. Ins. Co.*, 18 F.3d 474, 483 (7th Cir. 1994), *Casey Elec., LLC v. Constr. Mgmt. Servs., Inc.*, No. 3:09-CV-00469 (PCD), 2009 WL 3853819, at *3-4 (D. Conn. Nov. 17, 2009) (third-party beneficiary could make out complaint for breach of covenant of good faith); *see also Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc.*, 46 N.Y.S.3d 246, 254 (N.Y. App. Div. 2017).

Maritime law is silent on the question of whether a party may allege a breach of the duty of good faith and fair dealing as an independent cause of action where they have already brought a claim for breach of contract. *See, e.g.*, *BVI Marine Constr. Ltd. v. ECS-Florida, LLC*, No. 12-80225-CIV, 2013 WL 6768646, at *6 (S.D. Fla. Dec. 20, 2013) ("[T]here appears to be no maritime rule with respect to this issue."). The Court therefore looks to New York law, which "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also Butvin v. DoubleClick Inc.*, No. 99-CV-4727, 2001 WL 228121, at *8 (S.D.N.Y. Mar. 7, 2001). Rather, an implied covenant of good faith and fair dealing claim can be maintained along with a breach of contract claim "only if the damages sought by the plaintiff for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract." *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 498 (S.D.N.Y. 2017).

Plaintiffs argue that their claim for breach of the covenant of good faith rests on a different set of facts than its claim for breach of contract. Resp. at 16. According to Plaintiffs, the breach of

15

contract claim involves Seawolf's failure to maintain a vessel capable of conveying the Cargo according to the terms of the Voyage Charter. Plaintiffs' breach of the implied covenant of good faith claim, on the other hand, alleges that Seawolf "acted in bad faith during the performance of the Voyage by failing to disclose the true nature of their breach to Laurel," Id. at 20, and that those misrepresentations made it impossible for Plaintiffs to take measures to mitigate the cost of Seawolf's alleged breach of contract, Compl. ¶¶ 73, 74. Plaintiffs' lack of reliable information purportedly imposed further losses because disclosure of the true state of the Vessel "could (and likely would) have resulted in Plaintiffs removing the Cargo either at an interim discharge port or in a ship-to-ship transfer" which "would have eliminated Seawolf's ability to make claim for the significant freight that was to be paid if the Vessel managed to get to Singapore." *Id.*

Plaintiffs' allegations are vague as to precisely how they would have mitigated their damages if Seawolf had informed them of the cause and nature of the Vessel's delays, and the Complaint only identifies two short delays in the early part of the voyage about which Seawolf failed to inform Plaintiffs, *id.* ¶¶ 64–70. Still, drawing all inferences in Plaintffs' favor, the Court finds that Plaintiffs have alleged "distinct factual allegations" for breach of the implied covenant and the breach of contract claims. *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20-CV-5015 (VEC), 2021 WL 3668092, at *4 (S.D.N.Y. Aug. 17, 2021). Although underlying both claims is the contention that Seawolf delivered the Vessel in poor condition, the breach of contract claim depends on whether Seawolf breached the guarantees in the Voyage Charter, while the breach of the implied covenant of good faith claim flows from whether Seawolf failed to inform Plaintiffs about the state of the Vessel. Compl. ¶ 72. Thus, even if discovery demonstrates Seawolf did not "breach[] the terms of the contract in a technical sense," Plaintiffs may still establish that Seawolf violated the implied covenant of good faith in its performance under the Voyage Charter

16

by failing to disclose the "severity of the situation" and "deprived [the Freepoint Entities] of the benefit of [the] bargain," namely, the timely delivery of the Cargo. *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 56 (2d Cir. 2009). Seawolf's motion to dismiss the breach of covenant of good faith and fair dealing is therefore denied.

### III.    Conversion Claim

In order to make out a claim for the federal maritime tort of conversion, a party must plead that a defendant "appropriated the property in question for its own use or gain." *Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC*, 77 F. Supp. 3d 364, 369 (S.D.N.Y. 2015); *see also Glickfeld v. Howard Van Lines, Inc.*, 213 F.2d 723, 727 (9th Cir. 1954); *Rafaella Gallery, Inc. v. United Parcel Serv., Inc.*, 818 F. Supp. 53, 55 (S.D.N.Y. 1993) ("mere misdelivery" does not qualify as conversion).

Plaintiffs assert that Seawolf "intentionally and wrongfully exercised dominion and control over the Cargo by manipulating the communications to Plaintiffs and Laurel with respect to the stoppages, breakdowns, and delays," thus "depriv[ing] [Freepoint Singapore] of the information that would have enabled it to make a reasonable decision with respect to the continuation of the Voyage." Compl. ¶¶ 103, 104. Plaintiffs fail, however, to allege that Seawolf "appropriated the property for its own use or gain." *Glickfeld*, 213 F.2d at 727; *see Gluckman v. Am. Airlines, Inc.*, No. 92-CV-3740 (SWK), 1994 WL 705324, at *2 (S.D.N.Y. Dec. 16, 1994), *modified*, 1995 WL 11065 (S.D.N.Y. Jan. 12, 1995) ("Since it is undisputed that neither [Defendant] nor any of its employees appropriated [the property] for the benefit of [Defendant], no conversion could have occurred in this case."). Seawolf's purported failure to provide accurate or current information to the Freepoint Entities about the whereabouts of the Cargo during the voyage does not, by itself,

support a claim for conversion. Even assuming that Seawolf "exerted dominion" over the Cargo by misleading Plaintiffs about the precise location of that Cargo and the cause for delays, Plaintiffs do not allege that Seawolf appropriated the Cargo for its own use. *Thypin Steel Co. v. Certain Bills of Lading Issued for Cargo of 3017 Metric Tons, More or Less, of Hot Rolled Steel Plate Laden on Bd. M/V Geroi Panfilovsky*, No. 96-CIV-2166 (RPP), 1998 WL 912100, at *6 (S.D.N.Y. Dec. 30, 1998), *aff'd in part, dismissed in part on other grounds sub nom. Thypin Steel Co. v. Asoma Corp.*, 215 F.3d 273 (2d Cir. 2000).

*Gowanus Indus. Park v. Arthur H. Sulzer Assocs.*, on which Plaintiffs rely, is inapposite. No. 06-CV-105 (KAM) (JO), 2014 WL 4370643 (E.D.N.Y. July 22, 2014), *adopted by* 2014 WL 4370722 (E.D.N.Y. Sept. 2, 2014). There, a counterclaimant sought the return of a barge, but the defendants refused and "willfully withheld" it from its owners. In allowing a conversion claim to proceed, the court noted that it depended on the defendant refusing to "surrender[] the barge to its rightful owner upon demand." *Id* at *5. Plaintiffs here have not alleged they made any such demand. [5] Indeed, the Cargo was delivered to Plaintiffs, and they have not alleged that any of the Cargo was stolen or damaged. Plaintiffs' conversion claim is therefore dismissed.

---

[5] Plaintiffs' reliance on *Leveraged Leasing Admin. Corp. v. PacifiCorp Cap., Inc.*, 87 F.3d 44, 50 (2d Cir. 1996), which applies New York law and Plaintiffs cite for the proposition that "demand and refusal are not necessary" to make out a conversion claim, Resp. at 23, is also misplaced. "[F]ederal courts and New York courts follow different rules for what constitutes proof of conversion." *Baloise Insurance Co., Ltd. v. United Airlines, Inc.*, 723 F. Supp. 195, 198 (S.D.N.Y. 1989).

## CONCLUSION

For the foregoing reasons, Defendant's motion for partial judgment on the pleadings is granted in part and denied in part. Plaintiffs' claims against Defendant Seawolf for breach of contract and the implied covenant of good faith and fair dealing survive, while the claim for conversion is dismissed.

The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 90.

SO ORDERED.

Dated: September 30, 2022
New York, New York

_____
Hon. Ronnie Abrams
United States District Judge